Slip Op. 10-93

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
-------------------------------------------------------x
                                                       :
PSC VSMPO    AVISMA CORPORATION                        :
and VSMPA    TIRUS, U.S., INC.,                        :
                                                       :
              Plaintiff,                               :
                                                       :
     v.                                                :
                                                       :    Before: Judith M. Barzilay, Judge
UNITED STATES,                                         :    Consol. Court No. 08-00321
                                                       :    Public Version
              Defendant,                               :
                                                       :
              and                                      :
                                                       :
U.S. MAGNESIUM LLC,                                    :
                                                       :
              Defendant-Intervenor.                    :
                                                       :
-------------------------------------------------------x
```

## OPINION

[The court remands the U.S. Department of Commerce's redetermination.]

*Arent Fox LLP* (*John M. Gurley*, *Mark P. Lunn* and *Diana Dimitriuc Quaia*) for Plaintiffs PSC VSMPO-AVISMA Corporation and VSMPO-Tirus, US Inc.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*, Trial Attorney) for Defendant United States; *Daniel J. Calhoun*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant.

*King & Spalding, LLP* (*Stephen A. Jones* and *Jeffery B. Denning*) for Defendant-Intervenor US Magnesium LLC.

Dated:  August 17, 2010

Barzilay, Judge: This case concerns a challenge to the U.S. Department of Commerce's ("the Department" or "Commerce") determination in an antidumping administrative review covering pure and alloyed magnesium metal from the Russian Federation. Plaintiffs PSC VSMPO  Avisma Corporation ("Avisma") and VSMPA  Tirus, U.S., Inc., (collectively, "Plaintiffs") and Defendant-Intervenor U.S. Magnesium, LLC ("USM"), challenge Commerce's method for calculating the value of chlorine gas when determining the normal value for the subject merchandise in *Results of Redetermination Pursuant to Remand*, A-421-819 (Dep't Commerce Mar. 30, 2010) ("*Redetermination Results*").[1] Because the court finds that the Department's method for calculating the value for chlorine gas is not supported in the record and does not comport with the statute, the court remands the proceedings to Commerce for further consideration.

## I. Background & Procedural History.

### A. The Industrial Processes at Issue

A thorough understanding of this case demands familiarity with the industrial processes at issue.[2] Avisma is the world's largest producer of titanium. Pls. Br. App. Tab 3 Ex. 5 at 2; Pls. Br. App. Tab 5 at 11. Its production facility operates in two principal stages. In the carnallite refinement stage, enriched carnallite[3] undergoes dehydration and electrolysis to produce raw

---

[1] The subject merchandise in this case is pure and alloyed magnesium. Because chlorine gas and raw magnesium emerge as co-products in the carnallite refinement stage, Commerce must determine the value of chlorine gas in order to determine the value of raw magnesium and thus the subject merchandise.

[2] For a visual representation of the industrial process, see *infra* p. 4.

[3] Carnallite is "a mineral . . . consisting of a hydrous potassium-magnesium chloride." *Webster's Third New International Dictionary* 340 (2002).

magnesium and chlorine gas. Pls. Br. App. Tab 8 Ex. 1.A at 1. Avisma processes [[much]] of the resulting raw magnesium to create the subject merchandise and uses the [[ rest ]] later in the titanium production chain, as described below. Pls. Reply Br. App. Tab 18 at 3. Avisma uses the chlorine gas in three ways:[[Much]] goes toward the ilmenite catalyzation process, while [[some]] recycles into the carnallite refinement process, and [[some]] goes on to produce calcium chloride, a de-icer. Pls. Reply Br. App. Tab 18 at 3. Therefore, only a portion of the chlorine gas goes into the production of the subject merchandise as described more completely below.

In the next stage of production, which does not result in subject merchandise, chlorine gas reacts as a catalyst with ilmenite ore[4] to separate titanium from titanium oxide, resulting in titanium tetrachloride. Pls. Br. App. Tab 8 Ex. 1.A at 1. Avisma then uses raw magnesium and technical-quality magnesium[5] to separate the chlorine from the titanium tetrachloride, producing titanium sponge and magnesium chloride. Pls. Br. App. Tab 8 Ex. 1.A at 1. Avisma refines the titanium sponge to create salable products, including titanium ingots, billets, and slabs. Pls. Br. App. Tab 3 Ex. 5 ("*2006 Avisma Annual Report*") at 2. It subjects the magnesium chloride to electrolysis, splitting it into chlorine gas which feeds back into the ilmenite catalyzation process and technical-quality magnesium. Pls. Br. App. Tab 8 Ex. 1.A at 1. Avisma recycles the technical-quality magnesium into the titanium tetrachloride separation process. Pls. Br. App. Tab 8 Ex. 1.A at 1.

---

[4] The mineral ilmenite is "a compound of iron, titanium, and oxygen." *Webster's Third New International Dictionary* 1127 (2002).

[5] Unlike raw magnesium, technical-quality magnesium, due to impurities, cannot become subject merchandise. *Redetermination Results* at 6-7. However, in this production step, these two components are interchangable.

[[

]]

**Consol. Court No. 08-00321**                                                                                                   Page 5

    **B.  Procedural History**

    In 2007, Avisma and USM requested a review of an antidumping order covering imports of pure and alloyed magnesium from the Russian Federation for the period from April 1, 2006 to March 31, 2007.  *See Notice of Antidumping Duty Order:  Magnesium Metal from the Russian Federation*, 70 Fed. Reg. 19,930, 19,930 (Dep't Commerce Apr. 15, 2005).  On May 30, 2007, Commerce commenced the review, *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 72 Fed. Reg. 29,968, 29,968 (Dep't Commerce May 30, 2007), and nearly a year later published its preliminary results.  *Magnesium Metal from the Russian Federation:  Preliminary Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 24,541 (Dep't Commerce May 5, 2008).  At this point Avisma and USM submitted briefs proposing, *inter alia*, changes to the Department's methodology for determining the value of chlorine gas.  Commerce rejected a portion of Avisma's brief because it contained new factual information:  an affidavit from accounting expert Professor George Foster ("Foster Affidavit").  *See* Pls. Br. App. Tabs 8-11.

    On September 10, 2008, Commerce issued the final results of the subject administrative review.  *Magnesium Metal from the Russian Federation:  Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 52,642 (Dep't Commerce Sept. 10, 2008) ("*Final Results*").  To determine the normal value of the subject merchandise,[6] the Department employed a method

---

[6] In the antidumping context, the normal value of the subject merchandise is the price of that merchandise as sold for consumption in the exporting country at a time reasonably corresponding to that of the sale of the merchandise in the United States.  19 U.S.C. § 1677b(a)(1)(A)-(B)(i).  Correspondingly, the antidumping duty margin is the amount by which the normal value of the subject merchandise exceeds its export price or constructed export price.  *Id.* § 1673.

of constructing a value for chlorine gas which severed Avisma's production process at the point where raw magnesium and chlorine gas emerge from the carnallite refinement process. Pls. Br. App. Tab 14 ("*Final Results Issues and Decision Memorandum*") at 10. Commerce then constructed the value of Avisma's chlorine gas by taking a bulk quantity market value of liquid chlorine and adjusting it for transportation costs between facilities and for the estimated cost of converting the liquid chlorine to chlorine gas. *Final Results Issues and Decision Memorandum* at 18-19. The Department then allocated this cost among the co-products of the carnallite refinement process. *Id.* at 10. Commerce justified this methodology by claiming that because the Department perceived a clear split-off point at the carnallite refinement process, it was reasonable to ignore the parts of Avisma's operation subsequent to that process and to treat raw magnesium as one of Avisma's primary products. *Id*. at 14; *see also Redetermination Results* at 6. The Department additionally claimed, without explanation, that determining the value of chlorine gas by taking into account Avisma's entire operation would result in a value for chlorine gas too high relative to the value that Avisma obtains from it. *Final Results Issues and Decision Memorandum* at 14; *see also Redetermination Results* at 5. Because the normal value of the subject merchandise necessarily bears an inversely proportional relationship to the value of chlorine gas, its co-product in the carnallite refinement process, an "unreasonably" high value for chlorine gas would result in an unreasonably low normal value for the subject merchandise. *See Redetermination Results* at 13. A lower normal value for the subject merchandise, in turn, would lead to a lower antidumping duty rate.

      Plaintiffs and USM filed suit in this Court to contest the *Final Results*. Avisma claimed, *inter alia*, that Commerce employed an erroneous method to allocate joint costs between raw

**Consol. Court No. 08-00321**                                                                                         Page 7

magnesium and chlorine gas, and that Commerce inappropriately rejected the portions of its case brief containing the Foster Affidavit. *PSC VSMPO  Avisma Corp. v. United States*, Slip Op. 09-120, 2009 Ct. Int'l Trade LEXIS 127, at *5 (Oct. 20, 2009). USM also contested the Department's method for allocating joint costs between raw magnesium and chlorine gas. *Id*. In its decision, the court instructed Commerce to admit the Foster Affidavit to the record, citing concerns over the determination's accuracy given that the case presents an issue of first impression, and remanded the proceedings so that the Department could consider the affidavit's arguments. *Id*. at *22.

On March 30, 2010, Commerce issued its remand results, which left the methodology for constructing the value for chlorine gas unchanged. *Redetermination Results* at 4. Avisma again contests the Department's chlorine gas valuation methodology, arguing that the methodology inappropriately truncates the production process at Avisma's facilities and thereby ignores the intertwined nature of Avisma's operations. Pls. Br. 2-7. USM supports the *Redetermination Results* "in large part," but disagrees with the Department's method of constructing the value for chlorine gas. Def.-Int. Resp. 2.

## II.  Standard of Review

Because of the "complex" and "technical" nature of the Department's determinations, Commerce's expertise in determining these matters entitles it to great deference. *Fujitsu Gen., Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996). The court must sustain Commerce's determination so long as the determination is supported by "substantial evidence on the record" and is "otherwise in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**Consol. Court No. 08-00321**                                                                                     **Page 8**

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Novosteel SA v. United States*, 25 CIT 2, 6, 128 F. Supp. 2d 720, 725 (2001) (quotation marks & citation omitted). This evidence must consist of "more than a scintilla" but need not constitute a preponderance. *Id*. at 6, 128 F. Supp. 2d at 725 (citation omitted). To determine whether the Department supports its determination with substantial evidence, the court must take into account the entire record, including anything that detracts from the weight of the evidence that Commerce employs to make its determination. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Commerce must supply a "satisfactory explanation" for its determination, including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks & citation omitted). The court may not supply a "reasoned basis" for the Department's decision that Commerce itself did not give. *Id*. Even if it is possible to draw two inconsistent conclusions from the evidence on record, it does not mean that Commerce did not support its findings with substantial evidence. *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999).

To determine whether Commerce's findings are in accordance with law, the court applies the two-part test articulated by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*. 467 U.S. 837, 842-43 (1984). The court first must determine whether Congress has spoken directly to the issue in question; if so, the court must ensure that the Department's methods comport with "the unambiguously expressed intent of Congress." *Id*. at 843 (footnote omitted). If Congress is silent on the issue, the court must determine whether the methods that the Department employed to reach its conclusion are "based on a permissible

construction of the statute." *Id.* (footnote omitted).  The court must defer to Commerce's interpretation of the statute so long as it is reasonable and "may not substitute its own construction of a statutory provision for a reasonable interpretation made by" Commerce.  *Id*. at 844.

### III.  Discussion

How to value co-products in an antidumping case where the manufacturer in question produces one product   the subject merchandise   simultaneously with a second product that serves as a catalyst in the production of a third product is an issue of first impression for the Court.  When Commerce uses a constructed value as the normal value of the subject merchandise, Congress instructs the Department to take into account "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise . . . *in the ordinary course of business.*"  19 U.S.C. § 1677b(e)(1) (emphasis added).  The "ordinary course of business" means "[t]he transaction of business according to the common usages and customs of . . . the particular individual whose acts are under consideration."  *Black's Law Dictionary* 1098 (6th ed. 1990); *see also Black's Law Dictionary* 404, 1209 (9th ed. 2009).[7]  From a thorough examination of the record, the court finds that the Department's chosen chlorine gas valuation methodology in the *Redetermination Results* fails to take into account Avisma's ordinary course of business and, therefore, does not accord with law.

---

[7] The statute itself does not define "ordinary course of business."  It does define "ordinary course of trade."  The court notes that the phrases have different meanings and that "trade" connotes commercial transactions such as sales between individual entities.  *See, e.g.*, *NTN Corp. v. United States*, 28 CIT 108, 139, 306 F. Supp. 2d 1319, 1346-47 (2004).

**Consol. Court No. 08-00321**                                                                                                         Page 10

Avisma is primarily a producer of titanium sponge, and its business structure reflects this focus. Pls. Br. App. Tab 2 at 3 ("VSMPO-AVISMA is a titanium manufacturer and AVISMA's Berezniki facility supports that production."); *2006 Avisma Annual Report* 8. To that end, Avisma strives to produce raw magnesium and chlorine gas only in the quantities necessary to enable its overarching titanium operation. Pls. Br. App. Tab 2 at 6. The subject merchandise, pure and alloyed magnesium, is an ancillary product of the overall production process. Pls. Br. App. Tab 5 at 8; *see also* Pls. Br. App. Tab 2 at 6.

The subservient nature of magnesium production to titanium production becomes apparent from an examination of Avisma's finances. Titanium products account for 78 percent of Avisma's sales revenue, while only four percent comes from the subject merchandise. *2006 Avisma Annual Report* 8, 10, 17. This figure puts subject merchandise on par with ferrotitanium, aluminum and its alloys, and "other goods and services" in terms of Avisma's sales revenue, demonstrating its comparatively minor role. *2006 Avisma Annual Report* 10. In addition, the *2006 Avisma Annual Report* reveals that Avisma allocated 29% of its investments that year toward improvements in titanium sponge production, with only three percent going toward "other primary production areas." *2006 Avisma Annual Report* 22; *see also 2006 Avisma Annual Report* 23 (noting that "major modernization project in magnesium processing" geared toward increasing titanium sponge production). From a financial standpoint, Avisma's ordinary course of business places titanium in a preeminent position. Claiming that it is reasonable to treat magnesium as a primary product of Avisma, Commerce disregards the vast majority of Avisma's financial activity. *Compare Final Results Issues and Decision Memorandum* at 14 (truncating

**Consol. Court No. 08-00321**                                                                Page 11

production process at carnallite refinement stage), *with* § 1677b(e)(1) (directing Commerce to take into account entity's ordinary course of business when using constructed value as normal value).

Avisma's treatment of its raw magnesium production capabilities following its 2005 merger with titanium producer VSMPO underscores the subsidiary nature of the subject merchandise production in Avisma's ordinary course of business. Pls. Br. App. Tab 5 at 3. Even prior to the merger, Avisma planned to gradually reduce its raw magnesium output to the level minimally sufficient to produce the chlorine gas necessary for its titanium output projections. Pls. Br. App. Tab 5 at 3 ("It was understood that this merger would shift AVISMA's production focus *more* squarely into the production of . . . titanium sponge." (emphasis added)), 6-7. To achieve this goal, Avisma planned and carried out a gradual reduction in raw magnesium output [[

]].[8] Pls. Br. App. Tab 5 at 5-6. Over the course of the following three years, raw magnesium output   and therefore the output of its co-product

---

[8] Avisma found it economically expedient to reduce raw magnesium production gradually rather than immediately because it would provide "an opportunity to minimize its electrolysis operations while avoiding any layoffs by increasing its titanium production." Pls. Br. App. Tab 5 at 3. An immediate cessation of magnesium production would have subjected Avisma to disposal costs and workforce downsizing:
> Once a decision has [sic] been made to [[restrain]] [raw] magnesium production above a certain level (that need [sic] to produce chlorine), there were logical economic reasons for switching somewhat gradually in reducing production of magnesium. Generally, each electrolytic cell is budgeted to serve for [[many]] months between capital repairs. These are expensive repairs . . . and an abrupt stoppage would have resulted in [[         undesirable consequences
>         ]]. This would have been in addition to the loss of whatever material was loaded in the cells at the time of the stoppage.

Pls. Br. App. Tab 5 at 7-8. A 2006 mine collapse at Avisma's carnallite supplier caused Avisma to cut magnesium production more rapidly than originally intended. Pls. Br. App. Tab 5 at 6.

**Consol. Court No. 08-00321**                                                                                              Page 12

chlorine gas   dropped [[significantly]].  From the second quarter of 2006 to the first quarter of 2007 alone, raw magnesium output fell from [[  many  ]] metric tons to [[  fewer  ]] metric tons.  Pls. Br. App. Tab 6 Ex. 2SD-2.  By the end of 2006, raw magnesium production fell to the level minimally sufficient to produce Avisma's desired amount of chlorine gas.  Pls. Br. App. Tab 2 at 4-5 ("[P]roduction of magnesium was limited to the amount unavoidable under the existing technology and because of supply issues.").  Commerce's chlorine gas valuation methodology effectively disregards the ample record evidence that shows that Avisma's raw magnesium production is completely subservient to titanium production.  Pls. Br. App. Tab 2 at 5.

     Avisma's attempts to increase technical-quality magnesium production are further indicative of its desire to avoid production of subject merchandise to the extent possible.  *See* Pls. Br. App. Tab 5 at 4.  During the period of review, Avisma made steps toward increasing its output of technical-quality magnesium specifically to use in the titanium tetrachloride separation process so that Avisma could limit further its output of raw magnesium, and thus subject merchandise, to the amount necessary for Avisma to obtain chlorine gas in the quantities that it needs to make titanium.  Pls. Br. App. Tab 5 at 4.  The record evidence shows that subject merchandise production clearly does not lie at the heart of Avisma's business plans or operations; rather, it is an incidental product of Avisma's titanium production.  Treating subject merchandise otherwise does not reflect the costs incurred in Avisma's ordinary course of business as the statute requires.  § 1677b(e)(1).

     Despite the financial and operational cohesiveness of Avisma's titanium operations, the Department nevertheless belittles the integrated nature of Avisma's facility to justify its severing

**Consol. Court No. 08-00321**                                                                                                    Page 13

of Avisma's production process in its chlorine gas valuation methodology.  For example, the Department claims that the quantities of materials that travel between segments of the production process are too small to warrant considering the facility an integrated whole.  *Redetermination Results* at 8.  The Department claims that it is therefore reasonable to truncate its consideration of the production process at the carnallite refinement stage and calculate the value for chlorine gas considering only the outputs of that stage.  In reality, however, the record shows that the production process depends entirely on the movement of materials between stages.  Avisma primarily uses the chlorine gas produced from carnallite in the ilmenite catalyzation process.  Pls.Reply Br. App. Tab 18 at 3.  The raw magnesium produced jointly with chlorine gas not only becomes subject merchandise, but also plays a fundamental role in the titanium tetrachloride separation process.  Pls. Br. App. Tab 5 at 4.  In addition, Avisma takes the chlorine gas that it recovers along with technical-quality magnesium following the titanium tetrachloride separation process and recycles it into the ilmenite catalyzation process.  Pls. Br. App. Tab 2 at 5-6.  Although the raw magnesium and chlorine gas produced at the carnallite refinement stage serve crucial purposes throughout the chain of production, Commerce insists on employing a methodology that turns a blind eye to this undeniable fact.

     The 2006 mine collapse suffered by Avisma's carnallite supplier further highlights the interdependent nature of Avisma's operations.  Pls. Br. App. Tab 5 at 5; *see also 2006 Avisma Annual Report* 33.  After the accident, Avisma could not procure carnallite and, therefore, was unable to produce the raw magnesium and chlorine gas needed to run its operations.  Pls. Br. App. Tab 5 at 5.  This threat of a production collapse forced Avisma to purchase outside chlorine to continue its production of titanium.  Pls. Br. App. Tab 5 at 5.  Commerce characterizes

**Consol. Court No. 08-00321**                                                                 Page 14

Avisma's production facility as a series of discrete, independently-operating processes, but the events following the mine accident demonstrate that the processes cannot operate independently. The lack of carnallite threatened to halt not only the carnallite refinement process, but all of Avisma's production.[9]

The court finds nothing in the record to legitimize Commerce's characterization of Avisma's production process. *Cf. Thai Pineapple Pub. Co.*, 187 F.3d at 1365 ("Even if it is possible to draw two inconsistent conclusions from evidence contained in the record, this does not mean that Commerce's findings are not supported by substantial evidence."). Commerce claims that its method for valuing chlorine gas more closely comports with "economic reality" than other methods. *Redetermination Results* at 12. But Commerce may not substitute its own definition of "economic reality" for the standard which Congress has mandated. In other words, Commerce must calculate the value of the subject merchandise, including "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise," by taking into account Avisma's ordinary course of business. § 1677b(e)(1). The Department cannot take into account Avisma's ordinary course of business while basing its methodology to calculate the cost of chlorine gas in its overall determination of the normal value of the subject

---

[9] Additionally, the Department's justification for truncation is internally inconsistent. The Department severs the carnallite refinement process from the rest of the titanium production while claiming that the goal of its chlorine gas valuation methodology is to arrive at a price that accurately reflects the benefit Avisma obtains from chlorine gas. *Final Results Issues and Decision Memorandum* at 14-15. But Avisma obtains value from chlorine gas precisely as a means to produce titanium. The only other product that Avisma produces with chlorine gas is calcium chloride de-icer, which it sells at a loss as a way of disposing of excess chlorine gas. Pls. Br. App. Tab 5 at 6 n.3 ("This is a process of transforming excess chlorine into [[de-icer]] (i.e., a marketable, albeit inexpensive, product . . . .)"). Were it not for titanium production, Avisma would have no need for chlorine gas at all.

**Consol. Court No. 08-00321** Page 15

merchandise on a misapprehension of the company's production process. Because Commerce has failed to take into account Avisma's ordinary course of business in calculating the value for chlorine gas, its methodology does not accord with law. *See id.*; *Chevron U.S.A., Inc.,* 467 U.S. at 842-43.

## IV. Conclusion

For the foregoing reasons, it is

**ORDERED** that Commerce's *Redetermination Results* are **REMANDED** to the Department for further proceedings; it is further

**ORDERED** that Commerce recalculate the value for chlorine gas in its determination of the normal value of the subject merchandise, taking into account Avisma's ordinary course of business by focusing on Avisma's entire production process, including the stages of production encompassing and following ilmenite catalyzation; and it is further

**ORDERED** that Commerce shall have until November 9, 2010 to file its remand results with the Court. Plaintiffs and Defendant-Intervenor shall file comments, if any, with the Court no later than December 7, 2010.

Dated:  August 17, 2010            /s/ Judith M. Barzilay
        New York, New York         Judith M. Barzilay, Judge

## NOTICE OF ENTRY AND SERVICE

  This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

  Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

  Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble<br>
Clerk of the Court

Date: _____    By: _____
Deputy Clerk